**Case No. 24-1623**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

---

JAMES HULCE, on behalf of himself and all others similarly situated,

*Plaintiff-Appellant,*

v.

ZIPONGO INC., d/b/a Foodsmart

*Defendant-Appellee.*

---

On Appeal from the U.S. District Court for the Eastern District of Wisconsin in Case No. 2:23-cv-00159-LA
Honorable Lynn Adelman, District Court Judge

---

# DEFENDANT-APPELLEE ZIPONGO INC. D/B/A FOODSMART'S RESPONSE BRIEF


Ryan D. Watstein (Counsel of Record)
James M. Ruley
WATSTEIN TEREPKA, LLP
1055 Howell Mill Road, 8th Floor
Atlanta, Georgia 30318
Telephone: (404) 782-0695
E-mail: ryan@wtlaw.com
jruley@wtlaw.com

*Counsel for Defendant-Appellee*
*Zipongo Inc. d/b/a Foodsmart*

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1623

Short Caption: James Hulce v. Zipongo, Inc. d/b/a Foodsmart

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Zipongo Inc. d/b/a Foodsmart

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Watstein Terepka LLP

von Briesen & Roper s.c.

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Ryan Watstein    Date: August 28, 2024

Attorney's Printed Name: Ryan Watstein

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☑ No ☐

Address: Watstein Terepka LLP

1055 Howell Mill Rd. 8th Floor, Atlanta GA 30318

Phone Number: (404) 782-0695    Fax Number:

E-Mail Address: ryan@wtlaw.com

rev. 12/19 AK

Save As | Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1623

Short Caption: James Hulce v. Zipongo, Inc. d/b/a Foodsmart

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Zipongo Inc. d/b/a Foodsmart

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Watstein Terepka LLP

von Briesen & Roper s.c.

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ James Ruley Date: August 28, 2024

Attorney's Printed Name: James Ruley

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☐ No ☑

Address: Watstein Terepka LLP

1055 Howell Mill Rd. 8th Floor, Atlanta GA 30318

Phone Number: (404) 991-2684 Fax Number:

E-Mail Address: jruley@wtlaw.com

rev. 12/19 AK

## TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT....................i

TABLE OF AUTHORITIES....................v

JURISDICTIONAL STATEMENT....................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW....................2

STATEMENT OF THE CASE....................3

I. Introduction....................3

II. Statement of Facts....................6

A. Foodsmart Offers Free Services To CCHP Members....................6

B. Hulce Sued Over Phone Calls Offering Services That Were Free To Him Through CCHP....................11

III. The District Court Granted Summary Judgment To Foodsmart After Focused Discovery Because Foodsmart's Communications Were Not "Telephone Solicitations"....................13

SUMMARY OF THE ARGUMENT....................15

ARGUMENT....................17

I. Standard Of Review....................17

II. This Court Should Affirm Because Foodsmart's Communications Do Not Qualify As "Telephone Solicitations"....................18

A. Foodsmart's Offers Of Free Nutritional Counseling Services Were Not "Telephone Solicitations"....................18

B. Case Law Does Not Support Hulce's Novel Re-Interpretation Of The TCPA ........................ 24

III. Alternatively, This Court Can Affirm The District Court's Ruling Under The "Right for Any Reason" Doctrine, Providing Multiple Additional Grounds For Affirmance ..................................... 32

A. This Court Should Affirm Because Hulce's Urged Interpretation Of The DNC Rules Would Violate Foodsmart's Rights Under The First Amendment ........................... 34

B. This Court Should Affirm Because Foodsmart Isn't Directly Or Vicariously Liable For The Calls At Issue ...................................... 39

C. This Court Should Affirm Summary Judgment Because The Undisputed Evidence Shows Foodsmart And QCS Implemented Compliant Internal DNC Procedures ........................... 45

CONCLUSION ........................................................................................ 47

CERTIFICATE OF COMPLIANCE ......................................................... 49

CERTIFICATE OF SERVICE .................................................................. 50

## TABLE OF AUTHORITIES

**Cases**

*Am. Soc'y of Mech. Engineers v. Hydrolevel Corp.*,
456 U.S. 556 (1982) .......... 40, 41

*Barr v. Am. Ass'n of Political Consultants*,
591 U.S. 610 (2020) .......... 35, 37, 38

*Bridgeview Health Care Ctr. Ltd. v. Clark*,
2014 WL 7717584 (N.D. Il. 2014) .......... 42, 43

*Bridgeview Health Care Ctr. Ltd. v. Clark*,
816 F.3d 935 (7th Cir. 2016) .......... 42, 44

*Callier v. Wide Merch. Inv., Inc.*,
671 F. Supp. 3d 736 (W.D. Tex. 2023) .......... 43

*Carlton v. PDR Network, LLC*,
80 F.4th 466 (4th Cir. 2023) .......... 28

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
447 U.S. 557 (1980) .......... 38

*Cf. Craig v. Boren*,
429 U.S. 190 (1976) .......... 37

*Chesbro v. Best Buy Stores, L.P.*,
705 F.3d 913 (9th Cir. 2012) .......... 31

*Chinitz v. NRT W., Inc.*,
2019 WL 720996 (N.D. Cal. 2019) .......... 28

*Clarendon Nat'l Ins. Co. v. Medina*,
645 F.3d 928 (7th Cir. 2011) .......... 40

*Cordoba v. DIRECTV, LLC*,
2021 WL 6841777 (N.D. Ga. 2021) .......... 42, 43, 44, 46

*Edward J. DeBartolo Corp. v Florida Gul Coast Bldg. & Const. Trades Council*, 485 U.S. 568 (1988) .......... 38

*Edwards v. Signify Health, Inc.*,
2023 WL 3467558 (D. Nev. 2023)....................................................26

*Faucett v. Move, Inc.*,
2023 WL 2563071 (C.D. Cal. 2023)................................................27

*Fiorarancio v. WellCare Health Plans, Inc.*,
2022 WL 111062 (D.N.J. 2022) .......................................................31

*Franza v. Royal Caribbean Cruises, Ltd.*,
772 F.3d 1225 (11th Cir. 2014).......................................................43

*Freyja v. Dun & Bradstreet, Inc.*,
2015 WL 6163590 (C.D. Cal. 2015)..................................................25

*Friedman v. Torchmark Corp.*,
2013 WL 4102201 (S.D. Cal. 2013) .................................................26

*Fulton v. City of Phila.*,
141 S. Ct. 1868 (2021)....................................................................36

*Golan v. Veritas Ent., LLC*,
788 F.3d 814 (8th Cir. 2015)....................................................28, 31

*Hill v. InvestorPlace Media, LLC*,
2024 WL 1056030 (W.D.N.C. 2024) ................................................27

*Horton v. Tarrant Cnty. Hosp. Dist.*,
2022 WL 702536 (N.D. Tex. 2022) ..................................................26

*Hossfeld v. Allstate Ins. Co.*,
2024 WL 1328651 (N.D. Ill. Mar. 28, 2024)....................................39

*Ibanez v. Fla. Dep't of Bus. & Prof. Reg.*,
512 U.S. 136 (1994).................................................................37, 38

*Jones v. Royal Admin. Servs., Inc.*,
887 F.3d 443 (9th Cir. 2018)...........................................................42

*Keating v. Peterson's Nelnet, LLC*,
615 F. App'x 365 (6th Cir. 2015) ....................................................42

*Less v. Quest Diagnostics, Inc.*,
515 F. Supp. 3d 715 (N.D. Ohio 2021) ..................................................31

*Mainstream Mktg. Servs., Inc. v. FTC*,
358 F.3d 1228 (10th Cir. 2004)..............................................................19

*Mantha v. Quotewizard.com, LLC*,
2021 WL 6061919 (D. Mass. 2021).........................................................28

*Mantha v. Quotewizard.com, LLC*,
2022 WL 325722 (D. Ma. 2022) ..............................................................28

*Morris v. Unitedhealthcare Ins. Co.*,
2016 WL 7115973 (E.D. Tex. 2016).........................................................26

*Murphy v. DCI Biologicals Orlando, LLC*,
2013 WL 6865772 (M.D. Fla. 2013 ..................................................25, 26

*Old Security Life Ins. v. Continental Illinois Nat. Bank*,
740 F.2d 1384 (7th Cir. 1984)..................................................................40

*Paldo Sign & Display Co. v. Wagener Equities, Inc.*,
825 F.3d 793 (7th Cir. 2016) ...................................................................42

*Payton v. Kale Realty, LLC*,
164 F. Supp. 3d 1050 (N.D. Ill. 2016).....................................................31

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015)..........................................................................34, 35

*Republican Party of Minn. v. White*,
536 U.S. 765 (2002)..................................................................................37

*REXA, Inc. v. Chester*,
42 F.4th 652 (7th Cir. 2022) ............................................................17, 32

*Sable Commc'ns of Cal. v. FCC*,
492 U.S. 115 (1989)..................................................................................35

*Schulz v. Infogroup, Inc.*,
2020 WL 4201636 (N.D. Tex. 2020) .................................................24, 26

*Select Creations, Inc. v. Paliafito America, Inc.*,
830 F. Supp. 1223 (E.D. Wisc. 1993) .......... 40, 41

*Shupe v. Cap. One Bank USA NA*,
2016 WL 11591497 (D. Ariz. 2016) .......... 31

*Simmons v. Charter Communications, Inc.*,
222 F. Supp. 3d 121 (D. Conn. 2016) .......... 46

*Simmons v. Charter Communications, Inc.*,
686 Fed. Appx. 48 (2d Cir. 2016) .......... 46

*Smith v. State Farm Mut. Auto. Ins. Co.*,
30 F. Supp. 3d 765 (N.D. Ill. 2014) .......... 40

*Sorrell v. IMS Health Inc.*,
564 U.S. 522 (2011) .......... 35

*Spiegel v. Reynolds*,
2017 WL 4535951 (N.D. Ill. 2017) .......... 24, 26

*The Fla. Star v. B.J.F.*,
491 U.S. 524 (1989) .......... 37

*Thompson v. W. States Med. Ctr.*,
535 U.S. 357 (2002) .......... 38

*Trujillo v. Free Energy Sav. Co., LLC,*
2020 WL 7768722 (C.D. Cal. 2020) .......... 24, 25

*United States v. United Foods, Inc.*,
533 U.S. 405 (2001) .......... 34

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer*,
425 U.S. 748 (1976) .......... 34

*Visco v. Creditors Relief, LLC*,
2022 WL 488495 (D. Mass. 2022) .......... 31

*Warciak v. Subway Restaurants, Inc.*,
949 F.3d 354 (7th Cir. 2020) .......... 43

*Whittaker v. Freeway Ins. Servs. Am., LLC*,
2023 WL 167040 (D. Ariz. 2023) ....................................................28

*Willey v. Harris Cnty. Dist. Att'y*,
27 F.4th 1125 (5th Cir. 2022) .......................................................36

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015) ......................................................................36

**Statutes**

47 U.S.C. § 227(a)(4) ..................................................3, 19, 32

47 U.S.C. § 227(b)(1)(A)(iii) ..........................................................20

47 U.S.C. § 227(b)(1)(B) ...............................................................20

47 U.S.C. § 227(c)(5)......................................................................39

47 U.S.C. § 227(C)(5)(c).................................................................45

**Regulations**

47 C.F.R. § 64.1200(c)(2).......................................3, 18, 20, 32

47 C.F.R. § 64.1200(d).................................................................46

**Rules**

Fed. R. App. P. 44(a) ....................................................................39

**Other Authorities**

H.R. Rep. No. 102–317 (1991) ...................................................19, 23

*In re Dish Network, LLC*, 28 F.C.C. Rcd. 6574 (2013). ...........................39

*In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*,
18 F.C.C. Rcd. 14014 (F.C.C. June 26, 2003) .......................................30

*In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*,
20 F.C.C. Rcd. 3788 (2005) ..........................................................36

Restatement (Second) of Agency § 8 (1957) ............................................ 41

Restatement (Third) of Agency § 2.03 (2006) ......................................... 41

## JURISDICTIONAL STATEMENT

The jurisdictional statement of Plaintiff-Appellant is complete and correct.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

**1. Whether the district court correctly granted summary judgment in favor of Foodsmart because its offer of free nutritional counseling services to Hulce were not "telephone solicitations" within the meaning of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 et seq. (the "TCPA") and its associated regulations.**

**2. Whether the district court's judgment was correct on alternative grounds that it did not address, including:**

**a. Whether imposing liability on Foodsmart under the TCPA for offering free nutritional counseling services would violate Foodsmart's rights under the First Amendment.**

**b. Whether Foodsmart is directly or vicariously liable for the calls to Hulce, which were placed by its call vendor, Quality Control Services ("QCS");**

**c. Whether Foodsmart is entitled to summary judgment on Hulce's internal DNC claim because both it and QCS maintained TCPA-compliant policies and procedures.**

## STATEMENT OF THE CASE

### I. Introduction

Roughly two years ago, Plaintiff-Appellant James Hulce received a few phone calls and one text message offering him free nutritional counseling services. Defendant-Appellee Zipongo, Inc. d/b/a Foodsmart, in partnership with Hulce's healthcare plan that was funded by Wisconsin's state-run health program, offered these free services to help plan members like Hulce improve their nutrition and general health. Instead of taking advantage of those free services, Hulce regarded Foodsmart's offer of free nutritional counseling as cause for a federal lawsuit.

Hulce contends that Foodsmart's text and calls violated the Telephone Consumer Protection Act ("TCPA") which, through its associated regulations, prohibits the making of "any telephone solicitation" to someone who has placed his or her phone number on the National Do Not Call ("DNC") registry, as Hulce has. *See* 47 C.F.R. § 64.1200(c)(2). The TCPA defines a "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of" any good or service. 47 U.S.C. § 227(a)(4).

The district court granted summary judgment to Foodsmart after concluding that Foodsmart's communications were not "telephone solicitations" because they did not "encourage" Hulce to "purchase" anything. On the contrary, and as Hulce conceded below, Foodsmart offered its services at no charge to Hulce, if he wished to use them. The district court correctly held that, as a matter of straightforward statutory interpretation, Hulce could not have been "encouraged" to "purchase" nutritional counseling services that were offered to him for free.

The district court also correctly rejected Hulce's attempts to stretch the TCPA's definition of "telephone solicitation" beyond its plain and natural meaning. Specifically, Hulce argued that Foodsmart's communications should be deemed "telephone solicitations" because, per a contract that predated Foodsmart's communications to Hulce, Hulce's health plan (Chorus Community Healthcare Plans, or "CCHP") had agreed to pay Foodsmart for services rendered to CCHP's members. As the district court held, Foodsmart's communications to Hulce could not have "encouraged" CCHP to buy anything, both because CCHP never received the communications and because CCHP had already decided to

buy Foodsmart's services before Foodsmart ever made contact with Hulce.

The district court's interpretation of the TCPA was not erroneous and there is no reason to disturb it on appeal. But even if the district court had misconstrued the meaning of "telephone solicitation," there are several alternative grounds on which to affirm the grant of summary judgment to Foodsmart.

For one, Plaintiff's urged interpretation of the telephone solicitation rule, if adopted, would impose liability on Foodsmart based on the contents of non-commercial speech. Because the imposition of such liability cannot survive strict scrutiny, Hulce's proffered interpretation of the TCPA would violate Foodsmart's rights under the First Amendment.

For another, even if the call vendor used by Foodsmart (Quality Control Services, or "QCS") made "telephone solicitations" to Hulce that violated the TCPA, Foodsmart couldn't be liable for them. That's because the evidence shows that Hulce answered the first phone call QCS ever made to him, during which he claims he requested not to be contacted further. Assuming Hulce's testimony is true, Foodsmart cannot be directly or vicariously liable for calls after that date because the DNC

rules require more than one call in a 12-month period for a DNC violation. Foodsmart cannot be directly liable for any calls past the first one because it did not make the calls; QCS did. And it cannot be vicariously liable for QCS's conduct because Foodsmart did not permit QCS to call people who had requested not to be called.

Finally, Hulce's internal DNC claim fails because both Foodsmart and QCS have and honor internal DNC policies for telephone solicitations because they do not want to annoy people, even though they are not required by law to have them for the calls at issue because they are not telephone solicitations. To the extent Hulce received calls from QCS after he told him to stop calling, that was the result of one-off human error. As such, the safe harbor of the internal DNC rules precludes liability here.

For these reasons and others discussed below, this Court should affirm the district court's grant of summary judgment for Foodsmart.

## II. Statement of Facts

### A. Foodsmart Offers Free Services To CCHP Members

Foodsmart is a mission driven company that provides nutritional telehealth consultations to help individuals improve their overall health and to combat food insecurity, a serious problem for over 17,000,000

Americans who don't have enough food.[1] Supplemental Appendix ("SA") at 22, ¶ 4. To achieve this mission, Foodsmart works with healthcare plans to offer telehealth nutritional visits to plan members. *Id.* at 23, ¶ 5. Foodsmart's nutritional visits include dietary assessments, nutrition counseling, and meal planning for the whole family. *Id.* at ¶ 6. In addition, Foodsmart helps eligible insurance plan members enroll in government assistance programs, such as the Supplemental Nutrition Assistance Plan, or SNAP. *Id.* at ¶ 7. Foodsmart's services help improve nutritional choices (and members' overall health) while lowering healthcare costs for payers, including both private and state-funded insurance plans. *Id.* at ¶¶ 8-10; 2022 Optum Claims Study, SA at 29 ("Foodsmart saved the health plan, on average, $40 PMPM [per member per month] after adjusting for high value claims and other wellness programs, compared to a matched control group."); Foodsmart CCHP Study, SA at 31 ("the average 12 month PMPM claims savings generated

---

[1] Per statistics from the United States Department of Agriculture for 2022. "Key Statistics & Graphics" USDA, available at https://www.ers.usda.gov/topics/food-nutrition-assistance/food-security-in-the-u-s/key-statistics-graphics/#foodsecure (last accessed August 26, 2024) ("12.8 percent (17.0 million) of U.S. households were food insecure at some time during 2022").

by Foodsmart across major chronic conditions compared to controls: savings ranged from $62 to $871 PMPM in some members.").

CCHP is a provider of health plans that contracted with Foodsmart to provide free nutritional services to CCHP's plan members. SA at 23, ¶ 11. CCHP specifically chose to contract with Foodsmart to better serve its large number of plan members who receive services through Badgercare Plus, a state-run and state-funded Medicaid plan. *Id.* at ¶ 12. To qualify for BadgerCare Plus, members must either qualify as low-income or have a qualifying disability, making easily accessible telehealth nutritional plans a top priority to help address those members' overall health and food insecurity. *Id.* at 24, ¶ 14. Because Badgercare Plus is a state-funded healthcare program, members pay no cost for the services they receive through CCHP by means of a monthly premium, copay, or otherwise. *Id.* at 24, ¶ 13; 42 at 38:19-20 ("I did not pay any monthly premium for any BadgerCare Plus-related health care plans").

Per the agreement between CCHP and Foodsmart, Foodsmart offered its nutritional counseling services to CCHP members at no cost to them by sending informational text messages and phone calls to CCHP members. *Id.* at 24, ¶ 15. It did so at the request of CCHP, and after the

text messages and phone communications were approved by the state of Wisconsin. *Id.* at ¶ 16. In addition to informing members about these benefits that were fully covered through their plan, Foodsmart also conducted gift card giveaways and raffles to help these low-income members buy healthy groceries. *Id.* at ¶ 17.

Hulce alleges that he received a text message and several phone calls from Foodsmart. The text message, which was sent directly by Foodsmart, offered to help CCHP members assess and improve their nutritional health, and expressly provided that Foodsmart's services were free for CCHP members. *Id.* at ¶ 18. It provided:

> October is the month of sweet treats & pumpkin spice everything. Make meeting with a personal dietitian part of your Fall routine & balance your blood sugar
>
> Bundle Up! Get a $25 gift card when you complete a no cost visit in Oct., and $25 for taking the Foodsmart Nutriquiz!
> https://fdsmt.co/3NdUw1V
> Reply stop to unsubscribe.
>
> (414) 246-0371 • Oct 27, 2022

*Id.* at ¶ 19. Recipients of these messages who no longer wished to receive them could easily opt-out by responding "stop," as described in the message above. *Id.*

Foodsmart also called CCHP members through its vendor, QCS. *Id.* at 25, ¶ 20; 55 at ¶ 4. At the start of every outbound call, QCS informed members that the services were being offered to them for free through their healthcare provider. *Id.* at 55-56, ¶ 5. To this end, QCS's call script shows that QCS informed plan members that "Chorus Community Health Plans and Foodsmart have partnered to provide telehealth visits with a nutritional coach *at no cost to members*." *Id.* (emphasis added).

Because QCS only called CCHP members to inform them of free services provided to them through their state-funded plans, it lacked the ability to take or process payments. *Id.* at 56-57, ¶ 8. As such, if an individual who wasn't a CCHP member received an outbound call from QCS by mistake, the QCS representative would terminate the call. *Id.* at 56, ¶ 6.

Foodsmart also required QCS to honor all DNC requests, meaning if someone said "do not contact me again" or something similar, Foodsmart forbad QCS from making any further calls and required them to notify Foodsmart immediately so Foodsmart would know not to text the consumer. *Id.* at ¶ 7; 25 at ¶¶ 21-23. Both Foodsmart and QCS had written policies requiring them to immediately and indefinitely honor

such DNC requests and train their employees how to do so. *Id.* at 25-26, ¶¶ 27-31; 57, ¶¶ 11-15.

### B. Hulce Sued Over Phone Calls Offering Services That Were Free To Him Through CCHP

Hulce applied and was approved for the state-funded Badgercare Plus Medicaid program and began receiving completely free, state-funded healthcare in September 2021. *Id.* at 41, 36:24 to 37:4. Thereafter, Hulce received a single text message directly from Foodsmart in October 2022. *Id.* at 47, 59:10-16. Hulce responded "stop" to "unsubscribe" from further texts, as the text he received instructed he could do. *Id.* at 25, ¶ 24. He was promptly removed from the text-message list and wasn't texted again (even though that wasn't legally required because these were not "telephone solicitations" to which the TCPA's DNC rules apply). *Id.*

QCS first called Hulce in December 2021, and then again in February 2022. *Id.* at 57, ¶ 9; 60. Although Hulce testified that during those calls he asked not to be contacted further about Foodsmart's services, the call record notes only show that Hulce said he wasn't interested in Foodsmart's free services at that time. *Id.* at 50-51, 73:16 to 74:21; 57 at ¶ 9. QCS never notified Foodsmart that Hulce wasn't

interested in Foodsmart's services. *Id.* at 25, ¶ 23. Hulce received four additional phone calls from QCS in the late spring of 2022, all of which went unanswered. *Id.* at 57, ¶ 9; 60. In November 2022, Hulce claims he sent CCHP (not QCS or Foodsmart) a "grievance letter" asking not to be contacted about Foodsmart's service. *Id.* at 51, 74:21 to 75:6. The letter was never transmitted to Foodsmart or QCS, and so Hulce's number was not placed on QCS's or Foodsmart's internal DNC list. *Id.* at 25, ¶ 26; *Id.* at 57, ¶ 10.

In any event, for reasons unrelated to this lawsuit, Hulce terminated his CCHP insurance effective November 30, 2022. *Id.* at 42, 38:21 to 39:18. Hulce thereafter received three additional phone calls from QCS about thirty days after the termination of his CCHP plan: on January 3, 4, and 5, each of which went directly to voicemail. *Id.* at 50, 70:11 to 72:8. Hulce received these communications because the eligibility list (showing he was no longer a CCHP member) hadn't yet been updated in the short time window following the cancellation of his insurance. *Id.* at 25, ¶ 25.

Hulce then filed this lawsuit, in which he alleges Foodsmart violated the TCPA by sending telephone solicitations to him although his number is listed on the National DNC Registry and though he allegedly requested to be placed on QCS's internal DNC list. *Id.* at 12, ¶¶ 65-66. Hulce asked the district court to certify two nationwide TCPA classes: (a) one comprised of consumers who received telephone solicitation calls while their numbers were registered on the national DNC registry; and (b) one comprised of consumers who were contacted after they requested not to be contacted about Foodsmart's free services. *Id.* at 10, ¶ 51.

## III. The District Court Granted Summary Judgment To Foodsmart After Focused Discovery Because Foodsmart's Communications Were Not "Telephone Solicitations"

After Foodsmart filed its Answer, the Parties submitted a joint status report that proposed limiting discovery to whether the calls at issue were telephone solicitations. *See id.* at 15-19. Following a case management conference, the district court entered a scheduling order setting a discovery deadline for "plaintiff's individual claims," not just whether the alleged calls at issue were telephone solicitations. *See id.* at 20-21.

At the close of that individual discovery period, Foodsmart moved for summary judgment, arguing that the communications to Hulce were not "telephone solicitations," and hence not subject to the TCPA or its associated regulations. Foodsmart also argued that (1) imposing liability on Foodsmart under the TCPA would violate Foodsmart's rights under the First Amendment; (2) Foodsmart was not directly or vicariously liable for the calls placed by QCS; and (3) the undisputed evidence showed that both Foodsmart and QCS had and followed TCPA compliant policies, defeating Hulce's internal DNC claim.

Judge Adelman granted Foodsmart's motion. In a detailed written order, he concluded that the calls to Hulce were not "telephone solicitations" because they did not "encourage anyone to make a purchase." Appellant's Appendix ("AA") at 8. Judge Adelman reasoned that while Foodsmart's communications encouraged Hulce "to utilize Foodsmart's services," Hulce had "concede[d] that the purpose of the calls was not to encourage him to purchase Foodsmart's services, since the services were available to him for free." *Id.* at 6-7. The court also rejected Hulce's contention that, even if the communications did not encourage him to purchase anything, they encouraged CCHP to make a purchase.

*Id.* at 7-8. That's because CCHP already had contractually agreed to purchase services from Foodsmart and so it "needed no further encouragement to do so." *Id.* Hulce's argument to the contrary therefore "distorts the ordinary understanding of the statute's text by separating the encouragement element from the purchasing element." *Id.* at 8.

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's grant of summary judgment to Foodsmart because the challenged communications are not "telephone solicitations" under the TCPA. As the district court explained, Foodsmart's communications to Hulce urged him to utilize Foodsmart's free services, but they didn't encourage him to purchase anything, because the services were offered to him at no charge. Nor did the communications encourage CCHP to purchase Foodsmart's services on Hulce's behalf. The messages were not directed to CCHP, and in any event CCHP had contractually agreed to purchase the services from Foodsmart before Foodsmart ever contacted Hulce. Foodsmart's communications to Hulce could not have "encouraged" CCHP to buy something it had already agreed to purchase.

Hulce's arguments to the contrary are unavailing because they are contrary to the plain text of the TCPA. Hulce claims that the communications to him should be deemed encouragement to CCHP, which was the ultimate purchaser of Foodsmart's services. But, as the district court correctly held, it is unreasonable to read the TCPA such that communication made after a purchase has been made can still be deemed to "encourage" that pre-existing purchase. Hulce's arguments would, if accepted, divorce the "encouragement" and "purchase" elements of the statute in a way that distorts the TCPA's plain meaning and simply makes no sense. This Court should also reject Hulce's arguments, which the district court characterized as "not a reasonable understanding of the [statute]," and affirm.

But even if this Court disagreed with the district court's interpretation of the TCPA, three independent grounds exist for affirmance that were fully briefed but not reached by the district court. First, imposing TCPA liability on Foodsmart under these circumstances would violate Foodsmart's First Amendment rights because the TCPA's telephone solicitation ban would then regulate non-commercial speech in a content-based manner that couldn't survive strict scrutiny. Second,

Foodsmart cannot be directly liable for the calls at issue because it did not make them, nor can it be vicariously liable for calls made by QCS because Foodsmart did not permit QCS to call people who had requested not to be called. The evidence shows that if Hulce requested not to be contacted further in response to calls from QCS, that request was never conveyed to Foodsmart by QCS. Finally, Hulce's internal DNC claim fails because the undisputed evidence shows that both Foodsmart and QCS have and honor internal DNC policies for telephone solicitations. As such, the safe harbor of the internal DNC rules precludes liability here on Hulce's internal DNC claim.

This Court should affirm.

## ARGUMENT

### I. Standard Of Review

This Court reviews the grant of summary judgment *de novo*. *See REXA, Inc. v. Chester*, 42 F.4th 652 (7th Cir. 2022). While the Court must "construe the facts in the light most favorable to [the plaintiff] and draw all reasonable inferences in its favor . . . [a]n inference is not reasonable if it is directly contradicted by direct evidence provided at the summary judgment stage, nor is a 'conceivable' inference necessarily reasonable at

summary judgment." *Id.* This Court "may affirm a district court's grant of summary judgment on any basis that is apparent from our review of the record, provided that the issue was raised and the losing parties had a fair opportunity to contest it in the district court." *Id.* (quotation omitted).

## II. This Court Should Affirm Because Foodsmart's Communications Do Not Qualify As "Telephone Solicitations"

The district court correctly held that the calls Hulce received are not "telephone solicitations" for purposes of the TCPA. That's because the communications didn't encourage Hulce (or anyone) to purchase anything and instead offered Hulce free nutritional counseling services.

### A. Foodsmart's Offers Of Free Nutritional Counseling Services Were Not "Telephone Solicitations"

Pursuant to the TCPA, the Federal Communications Commission ("FCC") has promulgated a regulation providing that "[n]o person or entity shall initiate any **telephone solicitation** to: . . . [a] residential telephone subscriber who has registered his or her telephone number on the [DNC list] of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2) (emphasis added). That regulation incorporates the

TCPA's statutory definition of a "telephone solicitation," which is "a telephone call or message [initiated] for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services . . . ." 47 U.S.C. § 227(a)(4); *see also* 47 U.S.C. § 227(a)(4) (FCC regulation adopting the TCPA's definition).

Thus, by its terms, the DNC regulation at issue here is of limited application. It does not protect DNC registrants from receiving *any* unwanted calls, but only those calls "made for the purpose of encouraging the purchase or rental of a good or service." *Id.* And in authorizing the FCC to protect DNC registrants only from "telephone solicitations," Congress made a conscious choice premised on its finding that "most unwanted telephone solicitations are commercial in nature." H.R. Rep. No. 102–317, at 16 (1991); see also *Mainstream Mktg. Servs., Inc. v. FTC*, 358 F.3d 1228, 1235 (10th Cir. 2004) ("The TCPA therefore authorized the FCC to establish a national database of consumers who object to receiving 'telephone solicitations,' which the act defined as commercial ***sales*** calls.") In that way, Congress authorized the promulgation of DNC rules that have a much more limited application than other parts of the TCPA, which in some instances prohibit "any" calls, as opposed to the

DNC regulations' more limited ban on "telephone solicitations." *Compare* 47 C.F.R. § 64.1200(c)(2) (prohibiting only "telephone solicitations" to numbers registered on the National DNC Registry), *with* 47 U.S.C. § 227(b)(1)(A)(iii) (generally prohibiting the placement of "any call" to a cell phone using an "automatic telephone dialing system" or prerecorded message, where there is no prior express consent), and 47 U.S.C. § 227(b)(1)(B) (generally prohibiting "any telephone call to a residential telephone line" using a prerecorded message, where there is no prior express consent).

Hulce conceded below, and continues to concede in this appeal, that Foodsmart's communications didn't ask (much less encourage) him to purchase anything. AA at 6-7; see also App. Br. at 7 (quoting offers of a "zero cost telehealth visit" and "free consultation"). It is therefore undisputed that Foodsmart offered its services to Hulce at no cost to him. *Id*. Thus, while Hulce "was encouraged to utilize Foodsmart's services, he was not encouraged to purchase them because, to utilize them, he did not need to pay money or its equivalent." AA at 7. Hence, the district court was entirely correct in holding that Hulce did not receive a "telephone solicitation" from Foodsmart.

Hulce attempts to sidestep this straightforward application of the TCPA with the novel argument that texts or calls placed to only *him* somehow "encouraged" *someone else*—namely, CCHP—to purchase Foodsmart's services. That is so, according to Hulce, because CCHP agreed to pay Foodsmart for nutritional counseling services provided to CCHP's plan members. The district court committed no error by rejecting Hulce's attempt to stretch the TCPA's definition of "telephone solicitation" beyond its plain and ordinary meaning.

For one thing, as the district court found, Foodsmart's communications could not have been made for the purpose of "encouraging" CCHP to buy anything because CCHP already had agreed to pay for Foodsmart's services on behalf of its plan members. In other words, according to the district court, "CCHP had already agreed to pay Foodsmart for any services provided to its members, so CCHP needed no further encouragement to do so." *Id.* Moreover, "the communications were not targeted at CCHP in any way," and thus could not have "encouraged" CCHP to do anything, even if had not previously made its purchasing decision (which it did). *Id.*

Hulce does not (because he cannot) explain how a communication sent to him, which CCHP never received, could have "encouraged" CCHP to make a purchase it had previously agreed to make. Unable to counter the district court's sound reasoning, Hulce's arguments quickly devolve into semantics by arguing that the district court wrongly interpreted the word "encourage" to mean "persuade" or "urge," when alternative dictionary definitions allegedly give "encourage" a broader meaning. App. Brief at 15-16. He similarly argues that the district court's interpretation of the word "purchase" is too narrow because it doesn't "consider[] the purchase transaction as a whole." *Id.* at 19-21.

Hulce's quibbling over the proper definition of ordinary words like "encouraging" and "purchase" misses the point. Whether "encourage" means to "urge," "stimulate," "promote" or some other similar word, the fact remains that the TCPA requires the "encouragement" to be tied to a "purchase." And for there to be a purchase, there must be a purchaser capable of buying the good or service at issue. Here, however, Hulce was incapable of making a purchase because the services were offered to him for free. CCHP could not be a purchaser who was capable of being encouraged because it did not receive the communications at issue and

because it had already made its purchasing decision when it entered into a contract with Foodsmart, well before Foodsmart ever communicated with Hulce. Hence no reasonable definition of "encouraging" or "purchase" could convert Foodsmart's communications from what they were—communications about a free service—into something they were not—messages sent to encourage Hulce or CCHP to buy something from Foodsmart.

As the district court correctly concluded, Hulce's proffered interpretation of the TCPA improperly "separates the encouragement element from the purchasing element" and would, if adopted, do away with any requirement that the encouragement have any effect on the purchaser at all. AA at 8. Indeed, according to Hulce's arguments, the ultimate purchaser (here, CCHP) need not even be aware of the supposedly "encouraging" messages for TCPA liability to attach to a message. Hulce cites no authority for that remarkable proposition because none exists.[2]

[2] In addition to contradicting the text of the TCPA, adopting Hulce's atextual reading would perversely hurt the consumers the DNC registry is intended to protect. Indeed, since tens of millions of numbers are registered on the national DNC registry, such a ruling would prevent a large portion of the 17+ million food-insecure consumers in the U.S. from learning about potentially life-saving free programs just because those individuals (or someone who used to have their number many years ago) registered

### B. Case Law Does Not Support Hulce's Novel Re-Interpretation Of The TCPA

Unlike Hulce's unprecedented arguments, the district court's holding is well-supported by existing case law interpreting the TCPA. For example, in *Trujillo v. Free Energy Sav. Co., LLC*, a case the district court described as "entirely on point" (AA at 8), the defendant sent texts to notify low-income residential customers of its weatherization services that were free to them through a state-funded program. 2020 WL 7768722, at *2 (C.D. Cal. 2020). Just like Hulce here, Trujillo argued that the text messages were "telephone solicitations" because the free services ultimately encouraged his utility company to purchase the Defendant's services. *Id.*

The court concluded that "neither the statutory nor the regulatory text uses words like 'indirectly purchase' or 'purchase for the benefit of another person'" and observed that a host of courts around the country have concluded that "the target of the caller's encouragement must be the

---

their number on the DNC registry because they didn't want to receive auto warranty sales calls. The result would be fewer low-income CCHP members learning of the opportunity to receive free nutritional assistance through their state-funded insurance plans and higher healthcare costs for taxpayers. Congress passed the TCPA to curb sales solicitations; not those that notify consumers of a free public benefit. *See* H.R. Rep. No. 102–317, at 16 (1991) (the "most unwanted telephone solicitations are commercial in nature") (emphasis added).

recipient of the call for there to be an improper purpose." *Id.* at *2 (*quoting Spiegel v. Reynolds*, 2017 WL 4535951 at * 4 (N.D. Ill. Oct. 11, 2017)); *see also Schulz v. Infogroup, Inc.*, 2020 WL 4201636, at *3 (N.D. Tex. 2020) ("Nothing in the complaint suggests that Infogroup ultimately sought to sell or rent any services or product **to Schulz** or solicit an investment **from him**." (emphasis added)); *Freyja v. Dun & Bradstreet, Inc.*, 2015 WL 6163590, at *2 (C.D. Cal. 2015) ("Plaintiff points to no evidence that she was subjected to marketing during the call ...."); *Murphy v. DCI Biologicals Orlando, LLC*, 2013 WL 6865772, at *10 (M.D. Fla. 2013) ("Because neither of the messages in this case **encouraged Murphy** to purchase, rent, or invest in anything, they do not constitute 'telephone solicitations' under the TCPA." (emphasis added)).

*Trujillo* went on to reject the theory that an "implicit economic motive" was enough "to give rise to a reasonable inference of a specific purpose to encourage the purchase, rental, or investment in property, goods, or services." *Id.* at 3. The court concluded there was no triable issue because the text messages invited the recipient to schedule free services, not make a purchase, and Defendant lacked the ability to even receive payment from consumers. This is ***exactly*** the case here, as QCS's

communications here offered free, helpful health-improving services to low-income consumers and QCS lacked the ability to even take payment from them. SA at 23, ¶ 8.

And *Trujillo* is not alone. Numerous other courts across the country have "made the point that unless the purpose of the communication is to encourage someone to make a purchase, it is not a telephone solicitation." AA at 9; *see, e.g. Edwards v. Signify Health, Inc.,* 2023 WL 3467558, at *3 (D. Nev. 2023) (messages from healthcare provider for healthcare products that were free to him through his insurance did not encourage any purchase); *Horton v. Tarrant Cnty. Hosp. Dist.*, 2022 WL 702536 (N.D. Tex. 2022) (messages advising recipient about availability of free vaccines did not encourage any purchase); *Schulz v. Infogroup, Inc.*, 2020 WL 4201636 (N.D. Tex. 2020) (communications arguably offering recipient a free product were not telephone solicitations); *Spiegel*, 2017 WL 4535951, at *4 (communications soliciting donations were not telephone solicitations even though donations would be used to make purchases); *Morris v. Unitedhealthcare Ins. Co.*, 2016 WL 7115973, at *8-9 (E.D. Tex. 2016) (calls advising the recipient of availability of free insurance benefit not telephone solicitations); *Murphy v. DCI Biologicals*

*Orlando, LLC*, 2013 WL 6865772, at *10 (M.D. Fla. 2013) (communications in which sender offered to purchase recipient's plasma not telephone solicitations); *Friedman v. Torchmark Corp.*, 2013 WL 4102201, at *6 (S.D. Cal. 2013) (call promoting a "free webinar" was not a telephone solicitation because it did not attempt to sell anything to the plaintiff).

The cases on which Hulce relies, on the other hand, are inapposite. All involved messages designed the encourage *the consumer* to purchase products and services. *See* AA at 10 ("The cases cited by plaintiff . . . do not support his argument that a communication can be for the purpose of encouraging a purchase even if it does not encourage anyone to purchase anything"). In fact, these cases support ***Foodsmart's*** interpretation of the statute, not Hulce's because each case involves a scenario where the plaintiff received communications seeking to encourage him or her to purchase something—exactly what the provision at issue prohibits. *See Hill v. InvestorPlace Media, LLC,* 2024 WL 1056030, at *4 (W.D.N.C. 2024) (denying motion to dismiss because plaintiff plausibly alleged the communications received provided investment advice designed to encourage plaintiff to purchase

investment products); *Faucett v. Move, Inc.*, 2023 WL 2563071, at *4 (C.D. Cal. 2023) (denying motion to dismiss because the communications at issue were designed to connect plaintiff to a realtor, from whom he would purchase services); *Whittaker v. Freeway Ins. Servs. Am., LLC*, 2023 WL 167040, at *4 (D. Ariz. 2023) (denying motion to dismiss where Plaintiff plausibly alleged purpose of communications was to sell insurance to Plaintiff); *Mantha v. Quotewizard.com, LLC*, 2021 WL 6061919, at *2 (D. Mass. 2021), *R&R adopted*, 2022 WL 325722 (D. Ma. 2022) (denying summary judgment where purpose of communications was to encourage plaintiff to purchase insurance from third-party insurers); *Chinitz v. NRT W., Inc.*, 2019 WL 720996, at *1 (N.D. Cal. 2019) (denying motion to dismiss where purpose of communications was to encourage recipient to purchase brokerage services); *Golan v. Veritas Ent., LLC*, 788 F.3d 814, 819 (8th Cir. 2015) (concluding motion to dismiss was improper where defendant attempted to sell film tickets to plaintiff); *Carlton v. PDR Network, LLC*, 80 F.4th 466, 476-77 (4th Cir. 2023) (denying motion to dismiss where Plaintiff plausibly alleged communications at issue were commercial). And all but one of these cases was decided at the motion to dismiss stage, where all allegations

are construed in the plaintiff's favor. That makes these cases particularly inapplicable to Hulce's appeal from a grant of summary judgment against him.

Hulce mixes apples and oranges by arguing that the TCPA's definition of "unsolicited advertisement," which applies solely to junk faxes and not to the DNC regulations, should inform the interpretation of "telephone solicitation." But as the district court held, the two terms are not only unrelated within the TCPA but have markedly different statutory language. AA at 10-11. Specifically, "while a telephone solicitation must encourage the purchase of a good or service, an unsolicited advertisement need only advertise the commercial availability or quality of any property, good, or service." *Id*. at 11. Thus, the TCPA's definition of "unsolicited advertisement" has no relevance here.

For the same reasons, Hulce's appeal to the FCC's prerecorded message rule similarly falls flat. App. Br. at 23. He claims that the rule was amended to apply not just to "unsolicited advertisements" but also to "telephone solicitations" to address concerns about purported "free offers" consumers received from telemarketers. But that's inapposite

here, because Foodsmart isn't offering "free goods and services that are *part of an overall marketing campaign* to ***sell*** property, goods, or services" to consumers as the FCC was concerned with; instead, it's offering services that are completely free to low-income individuals through their state-sponsored health plans. *In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 225 (F.C.C. June 26, 2003). In any case, the FCC statement on which Hulce attempts to rely doesn't support his argument. There, the FCC states that "application of the prerecorded message rule should turn, not on the caller's characterization of the call, but on the purpose of the message." *Id.* Here, the district court looked to the messages' contents to decide their purpose was to offer a free service, and not to encourage a purchase.

Perhaps recognizing the text of the statute and the weight of authority is against him, Hulce argues that the context of the calls demonstrates that they are telephone solicitations. App. Brief at 24. This "context," according to Hulce, is that the messages were part of a marketing campaign that promoted Foodsmart's core business. Even if that were so, it would not change the fact that the services were offered

to Hulce for free, and hence could not have encouraged him to buy anything. No "context" changes that essential, dispositive fact. Moreover, the cases on which Hulce's "context" argument relies relate to other provisions of the TCPA that have no application here. *See Golan*, 788 F.3d at 820 (dealing with whether a communication qualified as "telemarketing"); *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012) (dealing with whether a communication qualified as an "unsolicited advertisement").

The additional case law Hulce cites in support of his context argument is inapposite, as each involves pleading stage challenges where the court merely determined that the complaints at issue plausibly alleged the calls were telephone solicitations. *See Fiorarancio v. WellCare Health Plans, Inc.,* 2022 WL 111062, at *1 (D.N.J. 2022) (determining at the pleading stage that plaintiff plausibly alleged the calls were "telephone solicitations"); *Less v. Quest Diagnostics, Inc.*, 515 F. Supp. 3d 715 (N.D. Ohio 2021) (same); *Visco v. Creditors Relief, LLC*, 2022 WL 488495, at *1 (D. Mass. 2022) (same); *Payton v. Kale Realty, LLC*, 164 F. Supp. 3d 1050, 1063 (N.D. Ill. 2016) (same); *Shupe v. Cap. One Bank USA NA*, 2016 WL 11591497, at *1 (D. Ariz. 2016) (same). But

the context of the calls here, with the benefit of discovery, makes clear that Foodsmart called individuals about services that were free to them so that they would utilize those services. That doesn't violate the law.

At bottom, the statutory and regulatory framework is clear: callers face liability only when they call a consumer on the DNC list and attempt to sell *the consumer* a product or service, as a "telephone solicitation" that "encourages" a purchase is only prohibited if made "to" a consumer. 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(c)(2). That didn't happen here. For the uncontroverted reason that none of Foodsmart's calls were "telephone solicitations" under the TCPA, Hulce's DNC claim fails as a matter of law.

## III. Alternatively, This Court Can Affirm The District Court's Ruling Under The "Right for Any Reason" Doctrine, Providing Multiple Additional Grounds For Affirmance

Even if this Court disagreed with the district court's interpretation of the telephone solicitation rule, it should still affirm. That's because the district court's ruling can be affirmed "on any basis that is apparent from [a] review of the record." *REXA*, 42 F.4th at 662 (quotation omitted). Here, three independent grounds unreached by the district court also mandate affirmance in Foodsmart's favor: (1) if adopted by this Court,

Hulce's urged interpretation of the DNC Rules would violate Foodsmart's rights under the First Amendment; (2) Foodsmart isn't directly or vicariously liable for the calls at issue; and (3) the undisputed evidence demonstrates Hulce's internal DNC claim fails because Foodsmart and QCS implemented compliant internal DNC procedures.[3]

[3] Plaintiff argued before the district court that the scheduling order precluded Foodsmart from making any of these arguments, because Plaintiff was prohibited from taking discovery on those issues. That is wrong. The original Court order defined Phase I Discovery as "discovery on plaintiff's individual claim" and set deadlines both for completing Phase I discovery and filing dispositive motions related to the same. *See* SA at 20-21. Although the parties' joint status report (SA at 15-19) proposed limiting discovery to whether the calls were telephone solicitation, the Court's scheduling order set a discovery deadline for "plaintiff's individual claims," not just whether the alleged calls at issue were telephone solicitations. SA at 20-21. Hulce's own discovery served on Foodsmart confirms he understood this, given that he asked for the identify of "the Third Parties or Vendors involved with the campaign(s) that resulted in phone calls and text messages to Plaintiff" and sought documents as broad as "all of Your policies regarding telephonic communications", "[a]ll business plans, marketing plans, memoranda, presentations, minutes, or other documents referencing Your strategy for telephonic communications to current or potential users for Your services." SA at 85-87. Hulce's counsel also questioned Foodsmart's corporate representative extensively about Foodsmart's relationship with QCS (*Id.* at 64-67, 37-38, 74-76) and Foodsmart's compliance with internal DNC list requirements. *Id.* at 68-73.

At bottom, whether Foodsmart is vicariously liable for the calls placed to Plaintiff and whether Foodsmart and QCS complied with their internal DNC policies are both dispositive of Plaintiff's "individual claims," which is within the scope of discovery the Court adopted.

### A. This Court Should Affirm Because Hulce's Urged Interpretation Of The DNC Rules Would Violate Foodsmart's Rights Under The First Amendment

If the Court were to hold that the TCPA imposes liability on Foodsmart for the messages at issue here, such an application of the TCPA's DNC rules would violate Foodsmart's rights under the First Amendment, because it would sanction non-commercial speech based on its contents. And content-based speech restrictions are almost *per se* unconstitutional. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional"). The Court should avoid that Constitutional question by affirming on the arguments above (and/or below).

In explaining the distinction between commercial and noncommercial speech, the Supreme Court has explained that commercial speech is "speech which does no more than propose a commercial transaction." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer*, 425 U.S. 748, 762 (1976) (quotation marks omitted); *accord United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). Here, it is undisputed that the communications at issue did not "propose

a commercial transaction," and they certainly did not "do[] no more than propose a commercial transaction." Instead, they provided information about an *entirely free* program that helped recipients and the taxpayers who fund Medicaid by battling food insecurity, bettering treatment outcomes, and reducing cost in the healthcare system. SA at 23, ¶¶ 8-10; 29, 31. Accordingly, the speech at issue is not commercial.

Regulations that restrict non-commercial speech in a content-based manner are subject to strict scrutiny. *Sorrell v. IMS Health Inc.*, 564 U.S. 522, 580 (2011). And it is undisputed that the DNC rules, under Hulce's interpretation, would regulate non-commercial speech based on their content. A call or text that says, "I am running for office and want your vote," "Join us for worship Sundays at 10 a.m.," or "Come to our charity event and donate clothing" would be lawful. But one that says "sign up today to receive a free nutritional visit through your healthcare plan" would be illegal. As the Supreme Court recently said in striking down another section of the TCPA, "[t]hat is about as content-based as it gets." *Barr v. Am. Ass'n of Political Consultants*, 591 U.S. 610, 619 (2020) (pl. op.).

As such, Hulce's interpretation of the DNC rules would need to survive strict scrutiny, which it could not do. To pass that test, a law must be the "least restrictive means" of advancing a "compelling" governmental interest. *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989). This test is so difficult to meet that the Supreme Court has labeled "content-based" laws "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U. S. 155, 163 (2015). So it's unsurprising that an interpretation of the DNC rules that sweeps in the healthcare speech at issue here would not pass either prong of the strict scrutiny test.

As to the first prong, the Supreme Court has described compelling interests as "'interests of the highest order'" and "'vital state interests.'" *Willey v. Harris Cnty. Dist. Att'y*, 27 F.4th 1125, 1131 (5th Cir. 2022) (quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 447 (2015); *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1881 (2021)). They include such interests as "combating terrorism, protecting election integrity, [and] remedying the effects of past unconstitutional race discrimination." *Willey*, 27 F.4th at 1131. Preventing a limited subset of at-risk Americans from being annoyed by calls about free healthcare services could thus never qualify as a "compelling" interest. *In re Rules & Regs. Implementing the Tel.*

*Consumer Prot. Act of 1991*, 20 F.C.C. Rcd. 3788, 3793 (2005) (FCC recognizing that purpose of DNC rules is curbing "fraudulent and abusive solicitations" and protective "privacy in the home", which the FCC itself labels as "substantial" interests, not compelling). Hulce's read of the DNC rules would be unconstitutional for this reason alone.

Nor could Hulce ever show that the DNC rules, as he interprets them, are the "least restrictive means" of reducing annoying calls. That is because the DNC rules unquestionably do not apply to all types of calls that people find *far more annoying* than those about free services available to them under their health plan. That includes debt collection calls, political solicitations, charitable donation calls for organizations that recipients may vehemently disagree with, and so on. After all, "[a] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) (*quoting The Fla. Star v. B.J.F.*, 491 U.S. 524, 541–542 (1989) (Scalia, J.,

concurring in part)). Hulce's interpretation of the DNC rules would therefore be unconstitutional for this additional reason.[4]

The Court should avoid those constitutional problems by adopting the "narrow[er] reading" of the TCPA's definition of telephone solicitations that does not sweep in the communications at issue. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371 (2002). Indeed, courts regularly adopt the textually plausible statutory interpretation that avoids constitutional concerns. *Edward J. DeBartolo Corp. v*

---

[4] Even if the speech at issue was commercial (which it isn't), the provision would still fail intermediate scrutiny because it is: (1) unsupported by a "substantial" government interest; (2) fails to "directly and materially advance[]" that interest; and (3) is not "no more extensive than necessary" to serve the government's interest. *Ibanez v. Fla. Dep't of Bus. & Prof. Reg.*, 512 U.S. 136, 142-43 (1994) (citation omitted). First, preventing a limited subset of at-risk Americans from being annoyed by calls about free healthcare services is not a substantial interest. *Cf. Craig v. Boren*, 429 U.S. 190, 199 (1976) ("[T]he protection of public health and safety" is a substantial interest). Second, even if the government had a substantial interest in avoiding annoying calls more generally, the telephone solicitation rule does not "materially advance" that interest since it bans only communications that promote goods or services for sale, excepting all other forms of unsolicited communications. *See Barr v. Am. Assoc. of Pol. Cons., Inc.*, 591 U.S. 610, 637 (2020) (explaining that the TCPA's content-based robocall restriction failed intermediate scrutiny because it permitted "many of the intrusive calls" that the "ban was enacted to prohibit") (Sotomayor, J., concurring). Indeed, even worse than in *Barr*, where the provision at issue was stricken, the DNC rules do not apply to *all types of calls* that people find far more annoying than those about free services available to them under their health plan. That includes debt collection calls, political solicitations, charitable donation calls for organizations that recipients may vehemently disagree with, and so on. Third, and relatedly, Plaintiff could never show that the DNC rules, as he interprets them, are "no more extensive than necessary," since Plaintiff's interpretation sweeps in speech about free healthcare services, which goes far beyond Congress's purported justifications for the DNC rules. *Ibanez*, 512 U.S. at 142-43 (*citing Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980))

*Florida Gul Coast Bldg. & Const. Trades Council*, 485 U.S. 568 (1988) (applying constitutional avoidance in First Amendment context). Interpreting the TCPA's definition of "telephone solicitation" to exclude the informational notices Foodsmart sent to low-income healthcare members is not just "plausible," but the only possible interpretation under the plain language of the statute, the great weight of authority, and all the evidence, as explained above. But were the Court to hold otherwise, the TCPA's ban on commercial telephone solicitations would not pass First Amendment scrutiny.[5]

### B. This Court Should Affirm Because Foodsmart Isn't Directly Or Vicariously Liable For The Calls At Issue

Even if the calls at issue were telephone solicitations (they aren't), this Court should affirm because the undisputed evidence shows that Foodsmart is not directly or vicariously liable for them.

[5] Because this Court should affirm the grant of summary judgment in Foodsmart's favor without reaching the "question of the constitutionality" of the TCPA's ban on commercial telephone solicitations in light of the doctrine of constitutional avoidance, Foodsmart believes it is unnecessary to file a Rule 44(a) notice. *See* Fed. R. App. P. 44(a). To the extent the Court believes otherwise, Foodsmart will file and serve such a notice.

The TCPA imposes civil liability only on the party who "makes" or "initiates" a call, and the FCC has clarified that a "person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call." *In re Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6582-83 (2013). Moreover, as relevant here the DNC rules only apply to "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity." *Hossfeld v. Allstate Ins. Co.*, 2024 WL 1328651, at *4 (N.D. Ill. Mar. 28, 2024) (*quoting* 47 U.S.C. § 227(c)(5)). Here, it is undisputed that Foodsmart didn't place the phone calls at issue in this case; QCS did. SA at 25, ¶ 20; *Id.* at 55, ¶ 4. Accordingly, Foodsmart is not directly liable for the phone calls in this case. *See Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 771 (N.D. Ill. 2014) ("Direct liability under the TCPA, however, applies only to entities that initiate the telemarketing calls") (quotation omitted).

So the only way Foodsmart could be liable for QCS's calls is if Hulce established one of three theories of agency: actual agency, apparent authority, or ratification. *In re Dish Network*, 28 F.C.C. Rcd. at 6584. Actual authority exists when a principal expressly authorizes an agent, and the agent acts on the principal's behalf and subject to the principal's

control. *Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 935 (7th Cir. 2011) (quotation omitted). An agent does not have actual authority to act contrary to the known wishes and instructions of its principal. *Select Creations, Inc. v. Paliafito America, Inc.*, 830 F. Supp. 1223, 1234 (E.D. Wisc. 1993) (*citing Old Security Life Ins. v. Continental Illinois Nat. Bank*, 740 F.2d 1384, 1391 (7th Cir. 1984)). Apparent authority exists when a third-party reasonably relies on the principal's manifestation of an agent's authority to the third party. *Am. Soc'y of Mech. Engineers v. Hydrolevel Corp.*, 456 U.S. 556, 565–74 (1982) (referencing the Restatement (Second) of Agency § 8 (1957)); Restatement (Third) of Agency § 2.03 (2006)). Statements by an agent are insufficient to create apparent authority. *Id.* To prove ratification, a plaintiff must show that: (1) the act, was performed on behalf of the principal, (2) the principal knew or reasonably should have known the material facts, (3) the principal ratified the entire transaction, and (4) the principal had the requisite legal capacity. *See Select Creations, Inc. v. Paliafito America, Inc.*, 830 F. Supp. 1223 (E.D. Wisc. 1993).

Here, Foodsmart cannot be vicariously liable for any of the calls QCS placed after Hulce claims that he told QCS to stop calling (which was on QCS's first call to Hulce).[6] That is because, assuming the truth of Hulce's allegations, QCS acted contrary to Foodsmart's instructions when it did not subsequently place him on its internal DNC list and transmit that request to Foodsmart. SA at 25, ¶ 23. Because calling Hulce after that request was contrary to the express instructions Foodsmart gave to QCS, Foodsmart cannot be liable for that conduct under any theory of actual authority. *See, e.g.*, *Bridgeview Health Care Ctr. Ltd. v. Clark*, 2014 WL 7717584, at *6 (N.D. Il. 2014), *aff'd*, 816 F.3d 935, 939 (7th Cir. 2016) (entering judgment for defendant in TCPA case on actual authority because, while vendor was permitted to send faxes, the "evidence presented does not establish that [defendant] expressly or impliedly authorized B2B or any B2B representative to send facsimile

[6] In the district court, Plaintiff argued there was a fact dispute about when he requested not to be contacted by QCS about Foodsmart's products and services. But the QCS call records definitively established that Plaintiff only spoke to live callers twice, in late 2021 and early 2022, and indicate that Plaintiff stated he wasn't interested in Foodsmart's services at that time. Plaintiff can't credibly dispute those call records because (a) they line up perfectly with the Foodsmart voicemails he produced in discovery, and (b) his testimony contradicts them because he admitted he doesn't remember every phone call he received. *Compare* SA at 51, 74:24 to 75:7 *with id.* at 56, ¶ 7.

ads outside of a twenty-mile radius"); *Cordoba v. DIRECTV, LLC*, No. 1:15-CV-3755-MHC, 2021 WL 6841777, at *5 (N.D. Ga. 2021) (granting summary judgment to defendant in TCPA case and finding no actual authority because telemarketing vendor was not permitted to make cold calls); *Paldo Sign & Display Co. v. Wagener Equities, Inc.*, 825 F.3d 793, 798 (7th Cir. 2016) (no actual authority in TCPA case where communications at issue prohibited by alleged principal); *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 450 (9th Cir. 2018) (same); *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 372 (6th Cir. 2015) (same).

Nor can Hulce prevail under a theory of apparent authority because the principal (Foodsmart) made no representations about QCS to Hulce, as required to prevail under a theory of apparent authority. *Cordoba*, 2021 WL 6841777, at *7 (quoting *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1252 (11th Cir. 2014)). And Hulce also cannot show that he "reasonably relied, to his detriment, on any apparent authority with which he alleges [Foodsmart] cloaked [QCS]." *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020) (affirming judgment in favor of defendant on TCPA claim). That further forecloses any

apparent authority argument as to the telephone calls made by QCS after Hulce claims he told it to stop calling.

Finally, Hulce cannot establish liability via ratification for those calls because Foodsmart didn't condone the alleged conduct with knowledge of the material facts—i.e., that Hulce stated to QCS that he wasn't interested in Foodsmart's services and that QCS called him anyway. *See Callier v. Wide Merch. Inv., Inc.*, 671 F. Supp. 3d 736, 746 (W.D. Tex. 2023) (no ratification in TCPA case because ratification only exists where a defendant "fail[s] to object to [] or repudiate" an act when it has full "knowledge of material facts"). Moreover, Foodsmart received no benefit from the calls to Hulce, which independently precludes a finding of ratification. *Clark*, 2014 WL 7717584, at *6, *aff'd*, 816 F.3d at 939 (holding that Hulce failed to prove ratification in TCPA case because there was no evidence that defendant benefited from faxes "sent outside of the twenty-mile radius by B2B, nor did he subsequently acquiesce to B2B having sent facsimiles outside of the twenty-mile radius"); *Cordoba*, 2021 WL 6841777, at *7 (no benefit where plaintiff failed to identify a single sale made through the alleged illegal cold calling).

Accordingly, even assuming the calls at issue are telephone solicitations (which they aren't), Foodsmart isn't liable for them because it did not place the calls at issue, nor did it authorize any calls after the first call, where Hulce asked not to be called further. Hulce could have added QCS to this lawsuit, as QCS could be directly liable as the caller. But Hulce chose to proceed against Foodsmart only, and so is required to establish that Foodsmart can be vicariously liable for the calls QCS made. Hulce has not and cannot meet this burden, so this Court can and should affirm on this ground alone.

### C. This Court Should Affirm Summary Judgment Because The Undisputed Evidence Shows Foodsmart And QCS Implemented Compliant Internal DNC Procedures

Finally, and although the Court need not reach this issue either because the calls at issue were not "telephone solicitations" within the meaning of the TCPA, Hulce's internal DNC claim also fails under the DNC safe harbor provision of the TCPA, which provides that:

> It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection.

47 U.S.C. § 227(C)(5)(c). The regulations promulgated under that section provide further detail on the "procedures" a company must "implement" to have a complete defense to an internal DNC claim. 47 C.F.R. § 64.1200(d) (detailing procedures that must be implemented).

Here, the undisputed evidence shows that both QCS and Foodsmart complied with these regulations, implementing procedures for: (1) maintaining internal, written DNC policies that are available on demand; (2) training employees on the existence and use of the DNC policies; (3) honoring all DNC requests; (4) maintaining records of all requests not to be contacted and honoring those requests for at least 5 years from the time they are made; and (5) identifying on each call, the name of the individual caller making the call, that the call was made on behalf of Foodsmart, and providing the telephone number and address at which the entity could be contacted, if requested. *See* SA at 25 ¶¶ 27-31; *id.* at 57, ¶¶ 11-15.

Foodsmart and QCS's implementation of these procedures is dispositive of Hulce's internal DNC claim, as any call to Hulce after a legitimate DNC request was exactly the sort of one-off, manual error that the safe harbor was designed to protect businesses with proper

procedures against.[7] *See Simmons v. Charter Communications, Inc.*, 222 F. Supp. 3d 121, 140 (D. Conn. 2016), aff'd 686 Fed. Appx. 48 (2d Cir. 2016) (in affirming summary judgment for defendant, noting that "[t]he mere fact that [plaintiff] received a call after his [] request is not a subsection (d)(3) violation" and "as long as Defendant had a proper procedure in place to implement its DNC policy, no reasonable jury could find for [plaintiff]"); *Cordoba*, 942 F.3d at 1265 ("Telemarketers can avoid liability for any violation if they can show that the violation was a mistake and that they meet minimum compliance standards").

Foodsmart is entitled to summary judgment on Hulce's internal DNC claim for this additional reason.

## CONCLUSION

The Court should affirm the district court's grant of summary judgment because the calls at issue are not telephone solicitations. Alternatively, this Court can and should affirm on the additional,

[7] Plaintiff argued below that he needed additional discovery to determine this was a one-off error. But he had ample opportunity to conduct discovery related to his individual claims and indeed both sought documents regarding Foodsmart's relevant policies and asked its corporate representative about the same at deposition. SA at 85-87; *id.* at 68-73. Despite this discovery, Plaintiff could point to nothing before the district court showing either Foodsmart or QCS didn't comply with their internal DNC rules.

independent grounds that Hulce's proposed interpretation would violate Foodsmart's rights under the First Amendment, Foodsmart is neither directly or vicariously liable for the calls at issue, and Foodsmart and QCS had TCPA-compliant internal DNC policies and procedures.

Respectfully submitted,

*/s/ Ryan D. Watstein*

Ryan D. Watstein (Counsel of Record)
James M. Ruley
Watstein Terepka LLP
1055 Howell Mill Road, 8th Floor
Atlanta, Georgia 30318
Telephone: (404) 782-0695
E-mail: ryan@watlaw.com
jruley@wtlaw.com

*Counsel for Defendant-Appellee Zipongo Inc. d/b/a Foodsmart*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation contained in Fed. R. App. P. 32(a)(7) because, excluding the portions exempted by Rule 32(f), this brief contains 9,510 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook.

*/s/ Ryan D. Watstein*
Ryan D. Watstein (Counsel of Record)

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2024, I caused to be electronically filed a true and correct copy of the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Ryan D. Watstein*
Ryan D. Watstein (Counsel of Record)